1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AARON MCCOY,                        No. 2:16-cv-0642 KJN P

12              Petitioner,

13        v.                             ORDER

14   CHRISTIAN PFEIFFER,[1]

15              Respondent.

16

17   I. Introduction

18        Petitioner is a state prisoner, proceeding pro se and in forma pauperis.  Petitioner filed an

19   application for petition of writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Both parties

20   consented to proceed before the undersigned for all purposes.  See 28 U.S.C. § 636(c).  Pending

21   before the court is respondent's motion to dismiss the habeas petition on the grounds that the

22   petition is barred by the statute of limitations, and petitioner failed to exhaust his state court

23   remedies.  For the reasons set forth below, respondent's motion to dismiss should be granted.

24   II. Chronology

25        The relevant chronology of this case is as follows:

26   _____

27   [1]  The Warden of Kern Valley State Prison is Christian Pfeiffer, who is substituted as respondent
     in this matter.  Fed. R. Civ. P. 25(d); see Brittingham v. United States, 982 F.2d 378, 379 (9th
28   Cir. 1992).

                                        1

1.  The underlying criminal offenses took place on September 14, 1986, at which time petitioner was 21 years old.  (Respondent's Lodged Document ("LD") 1, 2.)  In Sacramento County Superior Court, in Case No. 78299, a jury convicted petitioner of second degree murder, possession of a sawed-off shotgun and a hypodermic needle, and two counts of being a convicted felon in possession of a concealed firearm.  (LD 1.)  A number of enhancement allegations were admitted or found true.  (Id.)

2.  On June 8, 1987, petitioner was sentenced to an indeterminate state prison term of twenty-four years to life.  (LD 1.)  At the time of sentencing, petitioner was 22 years old.  (Id.)

3.  Petitioner filed an appeal through counsel in the Court of Appeal for the Third Appellate District, Case No. C002612.  On June 20, 1989, the appellate court affirmed the conviction.  (LD 2.)

4.  Petitioner did not file a petition for review in the California Supreme Court.

5.  On December 27, 1993,[2] petitioner filed a pro se petition for writ of habeas corpus in the Sacramento County Superior Court, Case No. 93F10652.  (LD 3.)  On February 21, 1994, the superior court denied the petition.  (LD 3.)

6.  On March 17, 1994, petitioner filed a pro se petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District, Case No. C017921.  (LD 4.)  The appellate court denied the petition on April 7, 1994.  (LD 5.)

7.  On October 29, 2007, petitioner filed a second pro se petition for writ of habeas corpus in the Sacramento County Superior Court, No. 07F10697.  (LD 6.)  On December 5, 2007, the Sacramento County Superior Court denied the petition.  (LD 7.)

8.  On March 21, 2016, petitioner constructively filed the instant federal petition.  (ECF No. 1.)  See Rule 3(d) of the Federal Rules Governing Section 2254 Cases.

////

---

[2]  Respondent was unable to obtain a copy of this petition.  (ECF No. 13 at 2 n.3.)  However, giving petitioner additional credit for mailing his first state habeas petition would not change the outcome here, as explained below.  Except for this first state court petition, all of petitioner's subsequent court filings were given benefit of the mailbox rule.  See Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010) (under the mailbox rule, the petition is deemed filed when handed to prison authorities for mailing).

III.  Legal Standards - Motion to Dismiss

Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court. . . ."  Id.  The Court of Appeals for the Ninth Circuit has referred to a respondent's motion to dismiss as a request for the court to dismiss under Rule 4 of the Rules Governing § 2254 Cases.  See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (1991).  Accordingly, the court will review respondent's motion to dismiss pursuant to its authority under Rule 4.

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") was enacted.  Section 2244(d)(1) of Title 8 of the United States Code provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) provides that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C. § 2244(d)(2).

Section 2244(d)(2) provides that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C. § 2244(d)(2).  Generally,

1    this means that the statute of limitations is tolled during the time after a state habeas petition has

2    been filed, but before a decision has been rendered.  Nedds v. Calderon, 678 F.3d 777, 780 (9th

3    Cir. 2012).  However, "a California habeas petitioner who unreasonably delays in filing a state

4    habeas petition is not entitled to the benefit of statutory tolling during the gap or interval

5    preceding the filing."  Id. at 781 (citing Carey v. Saffold, 536 U.S. 214, 225-27 (2002)).

6    Furthermore, the AEDPA "statute of limitations is not tolled from the time a final decision is

7    issued on direct state appeal and the time the first state collateral challenge is filed because there

8    is no case 'pending' during that interval."  Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999),

9    overruled on other grounds by Carey, 536 U.S. at 214.  In Carey, the United States Supreme

10   Court held that the limitation period is statutorily tolled during one complete round of state post-

11   conviction review, as long as such review is sought within the state's time frame for seeking such

12   review.  Id., 536 U.S. at 220, 222-23.  State habeas petitions filed after the one-year statute of

13   limitations has expired do not revive the statute of limitations and have no tolling effect.

14   Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("section 2244(d) does not permit the

15   reinitiation of the limitations period that has ended before the state petition was filed"); Jiminez v.

16   Rice, 276 F.3d 478, 482 (9th Cir. 2001).

17   IV.  Statutory Tolling

18        Petitioner does not dispute that the statute of limitations expired long before the instant

19   petition was filed.  However, to assist the court in evaluating petitioner's claim that he is entitled

20   to equitable tolling, the court first addresses the issue of statutory tolling.

21        On June 20, 1989, the California Court of Appeal for the Third Appellate District affirmed

22   the conviction.  Petitioner did not seek review in the California Supreme Court.  Thus, the state

23   appeal process became final within the meaning of 28 U.S.C. § 2244(d)(1)(A) when the time for

24   filing a petition for review expired on July 30, 1989, forty days after the California Court of

25   Appeal filed its decision.  See Cal. Ct. R. 8.264(b)(1), 8.500(e); Waldrip v. Hall, 548 F.3d 729,

26   735 (9th Cir. 2008).

27        Petitioner's conviction was final before April 24, 1996, AEDPA's effective date.  "For a

28   prisoner whose judgment became final before AEDPA was enacted, the one-year limitations

4

period runs from the AEDPA's effective date: April 24, 1996." Wood v. Milyard, 132 S. Ct. 1826, 1831 (2012); Allen v. Siebert, 552 U.S. 3, 4 (2007) (per curiam).   Accordingly, under § 2244(d)(1)(A), petitioner had until April 24, 1997, to timely file his federal habeas corpus petition.  Wood, 132 S. Ct. at 1831; Bryant v. Ariz. Attorney Gen., 499 F.3d 1056, 1059 (9th Cir. 2007).  Because petitioner did not constructively file his federal habeas corpus petition until March 21, 2016, it is over eighteen years late under 28 U.S.C. § 2244(d)(1)(A).

Petitioner filed no post-conviction challenges in state court within the one year limitations period.  A collateral challenge filed prior to the commencement of the federal statute of limitations period has no tolling effect.  Waldrip, 548 F.3d at 735.  Similarly, collateral challenges filed after the statute of limitations has run do not toll or revive an expired limitations period. Larsen v. Soto, 742 F.3d 1083, 1088 (9th Cir. 2013); Ferguson, 321 F.3d at 823.  Therefore, petitioner is not entitled to additional statutory tolling of the limitations period.  28 U.S.C. § 2244(d)(2).

Because the limitations period expired on April 24, 1997, and petitioner filed the instant petition on March 21, 2016, over 18 years too late, the instant petition is time-barred on its face unless petitioner can demonstrate that he is entitled to equitable tolling.

V.  Equitable Tolling

Petitioner contends that he is entitled to equitable tolling because he "has been dealing with mental health issues throughout his incarceration and prior to it, and this has at crucial times interfered with his filing appeals without an attorney or assistance."  (ECF No. 17 at 2.) Petitioner claims that from April 24, 1996, to April 24, 1997, he was "mentally and emotionally incapable of pursuing" habeas relief, and was not "even aware of this 'window.'"  (ECF No. 17 at 3.)  Petitioner claims he was a "mental mess," and "tried to busy himself through working, but only jumped around from job to job, to no avail, and was eventually accepted to a higher level of mental health designation and ultimately sent to Atascadero State Hospital."  (Id.)  Petitioner alleges that from January through April of 1997, he "was too incapacitated by his own inner turmoil to even attempt to think about a rush to get through a 'closing window.'"  (Id.)   Petitioner states that he "remains on meds," but does not identify the medications.  (ECF No. 17 at 6.)

5

Petitioner does not specifically identify his diagnosis, if any, during the relevant period, but claims he "now contends with PTSD issues." (ECF No. 17 at 6.)

### A. Legal Standards

"Equitable tolling may be available '[w]hen external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim.'" McMonagle v. Meyer, 802 F.3d 1093, 1099 (9th Cir. 2015) (quoting Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999)). "A petitioner who seeks equitable tolling of AEDPA's one-year filing deadline must show that (1) some 'extraordinary circumstance' prevented him from filing on time, and (2) he has diligently pursued his rights." Luna v. Kernan, 784 F.3d 640, 646 (9th Cir. 2015) (citing Holland v. Florida, 560 U.S. 631, 649 (2010)). A petitioner must provide specific facts regarding what was done to pursue the petitioner's claims to demonstrate that equitable tolling is warranted. Roy v. Lampert, 465 F.3d 964, 973 (9th Cir. 2006).

"The threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule." Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (citation omitted).

> To apply the doctrine in "extraordinary circumstances" necessarily suggests the doctrine's rarity, and the requirement that extraordinary circumstances "stood in his way" suggests that an external force must cause the untimeliness, rather than, as we have said, merely "oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.

Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir.) (internal citation omitted), cert. denied, 130 S. Ct. 244 (2009); see also Stillman v. LaMarque, 319 F.3d 1199, 1203 (9th Cir. 2003) (petitioner must show that the external force caused the untimeliness). It is petitioner's burden to demonstrate that he is entitled to equitable tolling. Espinoza-Matthews v. People of the State of California, 432 F.3d 1021, 1026 (9th Cir. 2005).

### B. Mental Illness

The Ninth Circuit has articulated a specific, two-part test for an equitable tolling claim based on a petitioner's mental impairment:

////

> (1) *First,* a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control by demonstrating the impairment was so severe that either
>
> > (a) petitioner was unable to rationally or factually to personally understand the need to timely file, or
> >
> > (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>
> (2) *Second,* the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

Bills v. Clark, 628 F.3d 1092, 1099-100 (9th Cir. 2010) (citations omitted) (italics in original); see also Orthel v. Yates, 795 F.3d 935, 938 (9th Cir. 2015) ("A petitioner seeking equitable tolling on the grounds of mental incompetence must show extraordinary circumstances, such as an inability to rationally or factually personally understand the need to timely file, or a mental state rendering an inability personally to prepare a habeas petition and effectuate its filing.").

"The relevant question [is,] '[d]id the mental impairment cause an untimely filing?'" Stancle v. Clay, 692 F.3d 948, 959 (9th Cir. 2012) (quoting Bills, 628 F.3d at 1100 n.3.) Bills provides further guidance for applying its two-part test:

> [T]o evaluate whether a petitioner is entitled to equitable tolling, the district court must:  (1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

Bills, 628 F.3d at 1100-01.  "This reiterates the stringency of the overall equitable tolling test:  the mental impairment must be so debilitating that it is the but-for cause of the delay, and even in cases of debilitating impairment the petitioner must still demonstrate diligence." Yeh v. Martel, 751 F.3d 1075, 1078 (9th Cir.), cert. denied sub nom. Yeh v. Biter, 135 S. Ct. 486 (2014), citing Bills, 628 F.3d at 1100.

////

A petitioner alleging a severe mental impairment during the filing period is not entitled to

an evidentiary hearing unless he or she makes "a good faith allegation that would, if true, entitle

him to equitable tolling." Laws v. Lamarque, 351 F.3d 919, 921 (9th Cir. 2003) (remanding for

consideration of whether the petitioner's delayed filing was "attributable to psychiatric

medication which deprived petitioner of any kind of consciousness" where the petitioner had

demonstrated "evidence of serious mental illness" by attaching prison psychiatric and medical

records). The district court must take care to ensure that the record regarding the petitioner's

mental illness is sufficiently developed to rule on the tolling issue. See Chick v. Chavez, 518

Fed. Appx. 567, 568 (9th Cir. 2013) (remanding "for further development of the record as to

[petitioner]'s mental competency and, if necessary, an evidentiary hearing"); see Bills, 628 F.3d

at 1099-100 (remanding where the petitioner was in the lowest percentile for verbal IQ, verbal

comprehension and working memory, and, according to clinical psychologists, was incapable of

inferential thinking necessary to complete a federal habeas form). Nevertheless, "[w]here the

record is amply developed, and where it indicates that the petitioner's mental incompetence was

not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated

to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's

allegations of mental incompetence." Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010); See

also Orthel, 795 F.3d at 939-40.

C. The Record

1. Petitioner's Exhibits to his Opposition

Petitioner's post-conviction progress reports show that from April 1995 to April 1996,

most of which predates the limitations period, petitioner was housed at the California Medical

Facility, Medium A custody, Psychiatric Category U, and petitioner was taking psychiatric

medication. (ECF No. 17 at 9.) Petitioner worked as a porter from January 31, 1995, until

December 15, 1995, when he changed to vocational horticulture. (ECF No. 17 at 9, 10.) On

January 1, 1996, petitioner changed from horticulture to computer, but was terminated from

school on March 22, 1995, after his custody level was increased to Close B custody due to

disciplinary problems. Petitioner received disciplinary reports for failure to report, working on

non-approved subjects, and misusing and manipulating the sick call system.  (ECF No. 17 at 9.)
On August 19, 1996, petitioner was endorsed for transfer to the Atascadero State Hospital
("ASH"), where he was housed from August 29, 1996, through September 19, 1996.  (ECF No.
17 at 10.)

Petitioner also provided page 8 of a life prisoner evaluation report, initial parole
consideration hearing, January calendar (undated), which summarizes events between January 31,
1995, and July 31, 1997.  (ECF No. 17 at 12.)  In 1996, petitioner was evaluated for placement at
ASH under California Penal Code § 2684,[3] and for endorsement as a Category "I" inmate.  (ECF
No. 17 at 12.)

On October 9, 1996, while housed at California Men's Colony, petitioner was placed in
administrative segregation ("ad seg") "after telling staff he had killed an inmate."  (ECF No. 17 at
12.)  Petitioner's classification committee suggested he should return to CMF noting that his
"current psych evaluation wasn't in the file."  (Id.)  At some point thereafter, petitioner was
transferred back to CMF, where he was returned to ad seg on December 29, 1996, due to a rules
violation for a physical altercation with another inmate.  On June 4, 1997, he was released to
general population, and assigned to the CCCMS[4] level of mental health care.  (ECF No. 17 at 12.)

---

[3]  Section 2684 provides, in pertinent part:  "If, in the opinion of the Secretary of the Department
of Corrections and Rehabilitation, the rehabilitation of any mentally ill, mentally deficient, or
insane person confined in a state prison may be expedited by treatment at any one of the state
hospitals under the jurisdiction of the State Department of State Hospitals or the State Department
of Developmental Services, the Secretary of the Department of Corrections and Rehabilitation,
with the approval of the Board of Parole Hearings for persons sentenced pursuant to subdivision
(b) of Section 1168, shall certify that fact to the director of the appropriate department who shall
evaluate the prisoner to determine if he or she would benefit from care and treatment in a state
hospital.  If the director of the appropriate department so determines, the superintendent of the
hospital shall receive the prisoner and keep him or her until in the opinion of the superintendent
the person has been treated to the extent that he or she will not benefit from further care and
treatment in the state hospital."  Cal. Penal Code § 2684(a).

[4]  "CCCMS" is an acronym for the Correctional Clinical Case Management System and inmates
designated to this level of care are those "whose symptoms are under control or in partial
remission and can function in the general prison population, administrative segregation, or
segregated housing units."  Coleman v. Schwarzenegger, 2009 WL 2430820, *15 n.24 (E.D. Cal.
2009).  Washington v. McDonald, 2010 WL 1999469 (C.D. Cal. Feb. 19, 2010).  The Enhanced
Outpatient Program ("EOP") is for inmates who suffer "Acute Onset or Significant
Decompensation of a serious mental disorder characterized by increased delusional thinking,

1    Petitioner provided a March 18, 2014 mental health treatment plan which reflects

2    petitioner's "diagnosis of Posttraumatic Stress Disorder by history." (ECF No. 17 at 14.)  The

3    clinician noted petitioner's arrival at Kern Valley State Prison from Solano on March 13, 2012, at

4    the CCCMS treatment setting.  "The cumulative data obtained from the clinical evaluation . . .

5    suggest [petitioner] does meet criteria for mental health services due to medical necessity."  (ECF

6    No. 17 at 14.)  Petitioner reported symptoms of PTSD, including "depression and anxiety," and

7    has been prescribed medication by a psychiatrist.  (Id.)  Petitioner was prescribed Fluoxetine (aka

8    Prozac) HCL 20 mg capsules.  Petitioner's risk factors were noted as "assaultive," with

9    "moderate chronic and low acute risk for suicide."  (Id.)

10                   2.  Mental Health Care - Court Records

11    The state court of appeal noted that petitioner's psychologist expert's testimony was

12    excluded at trial.  (LD 2 at 9.)  The expert had rendered a psychological evaluation of petitioner's

13    personality evaluation to show petitioner might act in a certain fashion, that he may be impulsive,

14    and if under stress he would be prone to act out.  (LD 2 at 9.)  The trial court rejected the expert

15    testimony because the reasonableness of petitioner's actions were to be judged by an objective

16    standard, not a subjective one.  (LD 2 at 9.)  The appellate court found that the trial court's ruling

17    was correct.  (LD 2 at 10.)

18    Petitioner did not challenge his competency to stand trial in his direct appeal.

19    However, in his first petition for writ of habeas corpus, filed in the state court of appeal,

20    petitioner claimed that his conviction was invalid due to new evidence of an ongoing psychiatric

21    condition throughout his incarceration, and claimed ineffective assistance of counsel based on

22    counsel's failure to defend on a theory of mental defect or intoxication.  (LD 4.)  In support of his

23    state court petition, petitioner appended two pages from an April 30, 1986 probation report,

24    written upon his earlier probation violation for vandalism/malicious mischief, which notes his

25    hallucinatory experiences, marked changes in affect, and vegetative signs with definitive
     impairment of reality testing and/or judgment," and who are unable to function in the general
26    prison population but do not require twenty-four hour nursing care or inpatient hospitalization.
     Coleman v. Schwarzenegger, 2009 WL 2430820, *15 n. 24 (citation omitted).  The Mental Health
27    Crisis Bed ("MHCB") Placement is "for inmates who are markedly impaired and/or dangerous to
28    others as a result of mental illness, or who are suicidal, and who require 24-hour nursing care." Id.

1     prior use of PCP.  (LD 4 (Ex. B).)  While housed in the county jail for the vandalism charge,

2     petitioner claimed he was treated by staff psychiatrist Dr. Green, who prescribed Mellaril, which

3     petitioner claimed help stabilize him after his PCP use.  (Id.; see also ECF No. 1 at 77.)

4         In an August 8, 1989 psychiatric consultation conducted while petitioner was housed at

5     the California Correctional Institution in Tehachapi, Dr. Tavoularis diagnosed petitioner as

6     suffering from chronic paranoid schizophrenia:  "[Petitioner] appears to be a walking time-bomb

7     who is refusing medication and in the absence of any behavioral abnormalities, he cannot be

8     given medication against his will."  (LD 4 (Ex. C).)  During the consult, petitioner reported "a

9     long history of being possessed by the devil," "battling with evil outside himself," and that since

10    he was a child, he had been treated with medications, none of which worked.  (Id.)  Petitioner told

11    the doctor that petitioner killed a man who laughed at him.  Petitioner said there was "too much

12    evil here at the prison, that there was evil all around him and that there was evil in [the doctor.]"

13    (Id.)

14        On his admission to ASH on May 14, 1990, petitioner's diagnosis was atypical psychosis

15    and psychoactive substance abuse NOS (in institutional remission) (Axis I); his Axis 4 was listed

16    as severe.  (LD 4 (Ex. D).)  On August 15, 1990, petitioner was discharged from ASH, with a

17    current GAF[5] of 60 (moderate symptoms).  The doctor noted that this ASH admission was

---

18  [5]  "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to

19  assess an individual's overall level of functioning, including the "psychological, social, and
    occupational functioning on a hypothetical continuum of mental health-illness."  Am. Psychiatric

20  Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed.
    2004) ("DSM IV-TR").  A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood

21  and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional
    truancy, or theft within the household), but generally functioning pretty well, has some

22  meaningful interpersonal relationships.  Id.  A GAF of 51-60 indicates moderate symptoms (e.g.,
    flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,

23  occupational, or school function (e.g., few friends, conflicts with peers or co-workers.)  Id.  A 41-
    50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or

24  serious impairment in social, work, or school functioning.  A GAF of 31-40 indicates:  "Some
    impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or

25  irrelevant) OR major impairment in several areas, such as work or school, family relations,
    judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to

26  work; child frequently beats up younger children, is defiant at home, and is failing at school.)"
    Id.  A GAF of 21-30 indicates:  "Behavior is considerably influenced by delusions or

27  hallucinations OR serious impairment in communication or judgment (e.g., sometimes

28

petitioner's first, and that his chief complaint on admission was petitioner requested group

therapy which was not available at CMF.  In prison, petitioner was prescribed Navane 10 mg at

bedtime.  (Id.)  Petitioner reported he was on cocaine at the time of the underlying offense, and a

syringe was found at his house.  (LD 4 (Ex. D).)

Petitioner was transferred to Folsom Prison; medical records from June and July of 1991

reflect petitioner's refusal to take the medications prescribed for his mental illness.  (LD 4 at 14 &

Ex. E.)  On July 2, 1991, petitioner was seen by Dr. Wong, staff psychologist, who wrote:

> Mr. McCoy demanded that the Dictaphone machine be unplugged.
> He then sits down and wants me to order a single cell for him.  "I
> hate people around me -- they put poison in my cornflakes.  Put
> radiation in my cornflakes.  Poison my coffee -- I feel bugs in my
> brain -- I was anointed one day then I was white in a P.O.W.
> camp."  He continues to exhibit fragmented thoughts in sentence
> salad with pervasive paranoid delusions of persecution. . . . abuse
> since age 15, and having auditory hallucinations of his mother and
> grandmother's voices, mostly accusatory of his being "no good."
> Psychotic symptoms seem to predate his committing murder Sept.
> of 1986.  Sympt[oms] began about 1983.  This 26 y/o muscular
> healthy looking black male seems to be floridly paranoic psychotic.
> On Stelazine 10 mg . . . Cogentin 2 mg.  No evid[ence] of adverse
> side effects.

(LD 4 at 14 & Ex. E.)  Diagnostic impression:  paranoid schizophrenia . . . exacerbation.  (Id.)

Dr. Wong increased Stelazine to 10 mg; Cogentin remained at 2 mg.  (Id.)  Petitioner reported his

family members have had serious mental health problems, including a brother in Napa.  (LD 4

(Ex. C, F).)

In April of 1993, Dr. Gross, staff psychiatrist at California State Prison, Sacramento,

opined that petitioner was "chronically psychotic," which is "schizophrenic or schizoaffective

disorder or a drug induced psychosis."  (LD 4 (Ex. F).)  "Several prior psychiatric examinations

point to a diagnosis of psychosis, probably secondary to excessive drug abuse."  (Id.)  Dr. Gross

stated there was "no appreciable change in [petitioner's] condition from December 16, 1992, to

[April 20, 1993];" petitioner agreed to take medication on April 14, 1993.  (Id.)

In November of 2007, petitioner challenged his restitution order in the state superior court

incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in
almost all areas (e.g., stays in bed all day; no job, home, or friends)."  Id.

and appended two pertinent exhibits:  (1) on November 16, 2000, petitioner was medically

unassigned and unable to work.  (LD 6 (Ex. 1).); and (2) on June 27, 2007, Dr. Gharakhanian

prescribed petitioner 800 mg Seroquel and 450 mg of Wellbutrin, both per day.  (LD 6 (Ex. C).)

### 3.  Petitioner's Pro Se Litigation[6]

On March 17, 1994, petitioner, proceeding pro se, filed a form petition for writ of habeas

corpus in the state appellate court, which also appended a 39 page typewritten petition, with a

table of contents, multiple, pertinent exhibits, and petitioner's declaration.  (LD 4.)  Petitioner

personally signed the form petition, the typewritten petition, the verification form, and the proof

of service.  (Id.)

On October 29, 2007, petitioner filed a second petition for writ of habeas corpus in the

Sacramento County Superior Court.  (LD 6.)  Although petitioner was proceeding pro se, he

noted in the appended verification form that he could not and did not prepare the petition because

he had a serious mental condition that required psychiatric medications, but could testify as a

competent witness.  (LD 6 at 9 n.1.)

Petitioner filed a civil rights action in this court, No. 2:90-cv-0214 RAR.  Although the

court found that service was appropriate, petitioner failed to return the forms for service of

process, and the case was dismissed on August 9, 1990.

On October 4, 1991, petitioner filed a pro se civil rights complaint, No. 2:91-cv-1374

GEB JFM; defendants' motion for judgment on the pleadings was granted on December 28, 1993.

In addition to the complaint, petitioner filed 16 different documents, including one request for

temporary restraining order.

In No. 2:92-cv-0491 DFL JFM, on March 27, 1992, petitioner filed a pro se civil rights

complaint; on October 17, 1994, defendants' motion for summary judgment was granted.

Petitioner filed 8 documents in this action.

---

[6]  Respondent provided copies of the docket sheets for these cases (LD 8), and asked the court to take judicial notice.  A court may take judicial notice of court records.  See, e.g., Bennett v. Medtronic, Inc., 285 F.3d 801, 803 n.2 (9th Cir. 2002) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (internal quotation omitted).

In No. 2:93-cv-0829 EJG GGH, petitioner filed a civil rights complaint which was dismissed with leave to file a petition for writ of habeas corpus.  The magistrate judge recommended the petition be dismissed for failure to exhaust state court remedies.  Petitioner filed objections and requested to be excused from the exhaustion requirement.  On January 31, 1994, petitioner's civil rights claims were stayed under Young v. Kenny, 907 F.2d 874 (9th Cir. (1990), and his habeas corpus petition was dismissed.  The case has not been reopened.

Petitioner and another inmate filed a joint civil rights complaint in No. 2:01-cv-1218 JAM GGH.  The district court severed petitioner's complaint into No. 2:02-cv-0166 MCE CMK. Plaintiff filed amended complaints on June 3, 2002, February 24, 2003, May 27, 2003, and October 12, 2004.  Id.  The court found that plaintiff stated a claim and could proceed on his claim that administrative segregation imposes an atypical and significant hardship; his claim of indifference to medical needs and his claim of a discriminatorily applied mental health policy. On July 14, 2006, the magistrate judge recommended that the 13 defendants' motion to dismiss be granted and that the action be dismissed based on petitioner's failure to exhaust administrative remedies.  Petitioner filed objections, but the findings and recommendations were adopted on September 11, 2006.  On September 29, 2006, plaintiff filed an appeal which was dismissed for lack of prosecution.  Id.

On May 8, 2009, petitioner filed a motion for temporary restraining order in No. 2:09-cv-1279 JFM.  However, on May 29, 2009, the case was transferred to the Fresno division of this court in No. 1:09-cv-0938 SMS.  On July 27, 2009, petitioner withdrew his motion because he convinced prison officials to re-hear the prison disciplinary, and the case was dismissed.  Id.

On October 25, 2011, petitioner filed a 65 page civil rights complaint in No. 1:11-cv-1771 LJO MJS.  Petitioner alleged violations of his Eighth Amendment rights based on the use of force during a cell extraction.  Defendants' motion for summary judgment was granted in part and denied in part on April 7, 2015.  The case settled at the June 5, 2015 settlement conference. Petitioner filed 28 different documents in this case, including requests for extensions of time, and a request to postpone consideration of the summary judgment motion under Rule 56.

////

1    Finally, on September 19, 2014, in No. 2:14-cv-2179 TLN EFB, petitioner filed a

2    petition for writ of mandate seeking his release from prison based on the February 10, 2014 order

3    for the California Department of Corrections and Rehabilitation to reduce its prison population

4    issued in Coleman v. Wilson, 2:90-cv-0520 LKK JFM.  On May 7, 2015, the magistrate judge

5    recommended that the petition be dismissed for lack of jurisdiction; petitioner timely filed

6    objections, but the findings were adopted on August 10, 2015, and the case dismissed without

7    prejudice.

8        D.  Discussion

9        After carefully considering the record, for the reasons stated herein, the undersigned finds

10   that petitioner is not entitled to equitable tolling.

11            1.  Severe Mental Impairment

12       Here, the relevant time period is between April 24, 1996 (based upon AEDPA's effective

13   date), when the one-year limitations period began, and March 21, 2016, the date the instant

14   petition was constructively filed.  See Laws, 351 F.3d at 923 (despite evidence of serious mental

15   illness, in 1993, Laws was adjudicated competent to stand trial, but such finding did not

16   determine Laws' competence from 1996-2000, when his habeas petitions should have been filed.)

17       Early records,[7] prior to the beginning of the limitations period, demonstrate petitioner was

18   suffering a severe mental impairment, including diagnoses of psychosis and chronic

19   schizophrenia.  His initial housing at ASH was in 1990, long before the limitations period began.

20   His second placement at ASH was from August 29, 1996 to September 19, 1996, but upon his

21   release from ASH, over eight months remained before the limitations period expired on April 24,

22   1997.  Despite his initial severe mental illness, petitioner's GAF scores were 58 on October 18,

23

24   _____

[7]  The court declines to consider petitioner's work/vocational history from 1994 to April 1996,
25   which was annotated in his life prisoner postconviction progress report.  He stopped working as a
     porter on December 15, 1995, and his vocational school was terminated on March 22, 1996, all
26   prior to the beginning of the limitations period.  Respondent is correct that the record reflects
     petitioner was removed from jobs because of disciplinary issues and "misusing and manipulating
27   the sick call system" (ECF No. 17 at 9), but the records are not sufficiently developed to
     determine whether such actions occurred while petitioner needed medication, was properly
28   medicated, or had refused medication.

1   1996, and 85 on February 22, 1997, well before the limitations period expired.

2           Importantly, the record also shows that once petitioner began a medication regimen he

3   was able to remain housed in the general population at the CCCMS level of care.  Shortly after

4   the limitations period expired, petitioner was transferred to the general population and the

5   CCCMS level of care on June 4, 1997, where it appears he remained through 2014.  Treatment at

6   the CCCMS level of care "suggests that petitioner was able to function despite his mental health

7   problems."  Washington, 2010 WL 1999469, at *2 (citing Coleman v. Schwarzenegger, 922 F.

8   Supp. 2d at 903 n.24 (inmates designated to the CCCMS level of care "are those 'whose

9   symptoms are under control or in partial remission and can function in the general prison

10  population, administrative segregation, or segregated housing unit'")).  Petitioner fails to explain

11  how his mental illness prevented him from earlier filing his federal petition.

12          Petitioner relies on Forbess v. Franke, 749 F.3d 837 (9th Cir. 2014).  (ECF No. 17 at 4.)

13  In Forbess, the Ninth Circuit reversed the district court's decision dismissing the habeas petition

14  as untimely, holding that the prisoner had showed that his mental illness was so severe that he

15  was unable to understand the need to timely file the petition and made it impossible, under all the

16  circumstances, to meet the filing deadline despite his diligence.  Id.  However, in Forbess, the

17  court found that Forbess' delusions persisted throughout the relevant period, and various doctors

18  opined that the prisoner suffered from severe delusions and documented Forbess' belief that he

19  was working for the FBI.  Id.  Here, petitioner provided no factual allegations suggesting his

20  psychosis continued beyond his placements in ASH.  Petitioner's return to general population and

21  to the CCCMS level of care belies such a suggestion.

22                  2.  Diligence

23          In any event, even if petitioner's mental illness was so severe as to meet the first prong of

24  Bills, petitioner failed to support his claim of diligence.

25          Petitioner "must diligently seek assistance and exploit whatever assistance is reasonably

26  available."  Bills, 628 F.3d at 1100.  A petitioner may satisfy the diligence prong if "the

27  petitioner's mental impairment prevented him from locating assistance or communicating with or

28  sufficiently supervising any assistance actually found."  Id.  But, as the Supreme Court noted in

1    <u>Holland</u>, the diligence requirement is not maximum diligence but rather reasonable diligence.

2    560 U.S. at 653.  Thus, the court must examine whether, given petitioner's impairments, he was

3    sufficiently diligent.

4         Here, the second prong of the <u>Bills</u> test is not satisfied because petitioner waited over

5    eighteen years to file his federal petition.  In this respect, petitioner fails to demonstrate diligence

6    by waiting years before seeking relief in federal court.  <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418-

7    19 (2005) (statute of limitations establish "conditions to filing" that place a limit on how long a

8    prisoner can wait before filing a postconviction petition).  "When a postconviction petition is

9    untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)."  <u>Allen</u>,

10   552 U.S. at 7, quoting <u>Pace</u>, 544 U.S. at 414.

11        Here, petitioner waited over 18 years before filing his federal petition.  Two of

12   petitioner's state habeas petitions were filed before the limitations period began, and his third

13   state habeas petition was filed over ten years after the limitations period expired.  Such delay

14   cannot demonstrate diligence.

15        Importantly, the record reflects that petitioner pursued myriad other legal remedies.

16   Petitioner filed four cases in federal court before the limitations began to run, and four more cases

17   after the limitations period expired, and in some of these cases, petitioner litigated the cases for

18   years.  Because petitioner failed to demonstrate that his mental illness deteriorated during the

19   interim period, he fails to demonstrate that his mental illness was the extraordinary circumstance

20   for his substantial delay.  <u>See</u> <u>Gaston v. Palmer</u>, 417 F.3d 1030 (9th Cir. 2005), <u>modified on other</u>

21   <u>grounds by</u>, 447 F.3d 1165 (9th Cir.); <u>see e.g.</u>, <u>Yeh</u>, 751 F.3d at 1078 (although prisoner had

22   history of mental illness, it was not severe enough to cause his delay because he repeatedly

23   "sought administrative and judicial remedies.").

24        Petitioner alleged no facts showing that he attempted to obtain assistance in order to file a

25   timely federal petition, or that his alleged mental impairments prevented him from locating or

26   communicating with others for assistance.  Instead, records reflect that petitioner sought such

27   legal assistance, and, with assistance, filed a state habeas petition in 2007, raising substantive

28   legal challenges.  The fact that petitioner may have been assisted by another inmate does not

1    change the analysis.  Petitioner apparently knew how to ask for help.

2         Petitioner claims that his mental health issues have "at crucial times interfered with his

3    filing appeals without . . . assistance."  (ECF No. 17 at 2.)  In Orthel, 795 F.3d at 941, the Ninth

4    Circuit affirmed the dismissal of the petition where substantial evidence showed that -- despite

5    fluctuations in mental health -- Orthel possessed sufficient competence and capability in the year

6    following the date on which the state court judgment became final as well as sufficient

7    competence during much of the eleven-year span between finality of judgment and filing of his

8    federal petition.  Petitioner's situation is similar to Orthel's.  Despite his initial severe mental

9    health issues, petitioner's GAF scores were 58 on October 18, 1996, and 85 on February 22,

10   1997.  While a GAF score is not dispositive, GAF scores of 58 and 85 are not consistent with a

11   finding that petitioner was so impaired by his mental illness that he could not understand the need

12   to seek habeas relief or take steps to seek such relief.  Also, petitioner was housed in general

13   population and treated at the CCCMS level of care from 1997 through 2014.  Moreover,

14   petitioner pursued many other legal claims throughout this period, suggesting his competence and

15   capability from 2001 to 2014.

16              3.  Causal Link

17        Petitioner must do more than simply assert his mental impairments to establish that he is

18   entitled to equitable tolling.  Even crediting petitioner's claim that he was mentally and

19   emotionally unable to pursue his claim from April 25, 1996, to April 24, 1997 (ECF No. 17 at 3),

20   petitioner alleged no facts demonstrating a causal connection between his alleged mental illness

21   and his inability to file a petition shortly thereafter, or for the next 17 years.  "Without any

22   allegation or evidence of how petitioner's symptoms actually caused him not to be able to file

23   despite his diligence, the court cannot find that he is entitled to equitable tolling."  Taylor v.

24   Knowles, 2009 WL 688615, at *6 (E.D. Cal. March 13, 2009), aff'd, 368 Fed. Appx. 796 (9th

25   Cir. 2010) (no equitable tolling where petitioner failed to show his auditory hallucinations, severe

26   depression, and anxiety "actually caused him not to be able to file despite his diligence"); see

27   Howell v. Roe, 2003 WL 403353, *4 (N.D. Cal.  Feb. 20, 2003) (rejecting equitable tolling where

28   petitioner's suicidal nature and depression did not make him mentally incompetent).  Here,

1  petitioner failed to demonstrate that his mental impairments prevented him from filing this action

2  before March 21, 2016.

3          Further, petitioner claims he was "unaware" of the statute of limitations "window."  Such

4  allegation suggests that his mental impairment was not the but-for cause of the delay in the filing

5  of his federal petition.  See Bills, 628 F.3d at 1100 ("The 'totality of the circumstances' inquiry in

6  the second prong [of the Bills test] "considers whether the petitioner's impairment was the but-for

7  cause of any delay.").  Rather, such explanation suggests that petitioner's ignorance of the law,

8  and not his mental illness, was the but-for cause of his failure to file a timely petition.  While

9  petitioner makes a general allegation that his mental illness caused his untimely filing,

10  petitioner's conclusory allegations do not establish a causal connection between his mental

11  impairments and his failure to file a timely petition.  Because petitioner has failed to establish a

12  causal link between his mental illness and his delay in filing his federal habeas petition, equitable

13  tolling is not warranted.  See Gaston, 417 F.3d at 1034-35 (upholding a finding that equitable

14  tolling was inapplicable where petitioner failed to show a causal connection between physical and

15  mental disabilities and inability to timely file petition), modified on other grounds by, 447 F.3d

16  1165 (9th Cir.).  See also Jones v. Marshall, 2009 WL 2189892 at *9 n.13 (C.D. Cal. July 17,

17  2009) (rejecting claim for equitable tolling based on alleged mental illness because petitioner

18  failed to establish that his mental condition was the "but for" cause of his failure to timely file a

19  federal habeas petition.).

20          E.  Conclusion:  No Equitable Tolling

21          Accordingly, considering the totality of the circumstances pertinent to petitioner's ability

22  to file a timely petition, petitioner has not shown that he suffered from a mental impairment so

23  severe as to cause his untimely filing.  Further, considering the entire record, petitioner does not

24  explain how his condition actually caused him not to be able to file a petition despite the exercise

25  of diligence.  Therefore, the undersigned finds that petitioner is not entitled to equitable tolling

26  based on mental illness.[8]  Because the petition must be dismissed as untimely, the undersigned

27  _____

28  [8]  An evidentiary hearing is not required to determine whether to allow equitable tolling on the
grounds of mental impairment where the petitioner's pertinent medical and prison records are

19

1   need not and does not reach the exhaustion issue.[9]

2   VI.   Alternative Start of Limitations Period?

3       Petitioner appears to seek a later accrual date under 28 § 2244(d)(1)(C).  Petitioner argues

4   that grounds five and six rely on California Senate Bill 261,[10] which passed on January 1, 2016.

5   He also alleges that ground seventeen is based on People v. Banks, 61 Cal. 4th 788 (Cal. July 9,

6   2015).  Respondent counters that such circumstances do not provide petitioner with a later-trigger

7   date.  (ECF No. 23 at 8.)

8       If a claim is based upon a constitutional right that is newly recognized and applied

9   retroactively to habeas cases by the United States Supreme Court, the one-year limitations period

10   begins to run on the date which the new right was initially recognized by the Supreme Court.  28

11   U.S.C. § 2244(d)(1)(C).  "In order for a constitutional right newly recognized by the Supreme

12   Court to delay the statute of limitations the right must not only be newly recognized, but must

13   also be retroactively applicable to cases on collateral review."  Packnett v. Ayers, 2008 WL

14   4951230, at *4 (C.D. Cal. Nov. 12, 2008).  The one-year statute of limitations "runs from the date

15   the right was initially recognized, even if the [Supreme] Court does not declare that right to be

16   retroactive until later."  Johnson v. Robert, 431 F. 3d 992, 992 (7th Cir. 2005) (citing Dodd v.

17   United States, 545 U.S. 353, 358-60 (2005)); see also Mason v. Almager, 2008 WL 5101012

---

18   submitted by the parties.  See Roberts v. Marshall, 627 F.3d at 773 (finding no equitable tolling

19   for mental impairment without conducting evidentiary hearing and based on review of records
     submitted with petition); see also Orthel, 795 F.3d at 939 (denying equitable tolling without

20   evidentiary hearing based on review of mental health and prison records submitted by
     respondent).  Here, because petitioner's lack of diligence for over 18 years demonstrates he fails

21   the second prong of Bills, undersigned concludes there is no need for additional mental health

22   records, and no evidentiary hearing is required.

23   [9]  Respondent contends that all of petitioner's claims are unexhausted because petitioner raised
     none of his claims in the California Supreme Court.  Petitioner does not deny that he failed to

24   exhaust his claims, but asks that he be "allowed to exhaust his claims as a protective petition."
     (ECF No. 17 at 7.)  Petitioner provides no additional facts or argument in support of such a

25   request.  Petitioner concedes, however, that "such remedy may be futile at this stage."  (ECF No.

26   17 at 4.)

27   [10]  California Senate Bill 261 extends eligibility for a youth offender parole hearing to certain
     inmates who were under the age of 23 at the time of their crime, and sentenced to a lengthy

28   sentence, with certain exceptions not applicable here.

(C.D. Cal. Dec. 2, 2008) (citing Johnson and Dodd).

A. California Senate Bill 261

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citations omitted); Swarthout v. Cooke, 131 S. Ct. 859, 863 (2011) (holding that it is of no federal concern whether state law was correctly applied). Therefore, to the extent petitioner challenges state court determinations on state law questions, the undersigned finds that petitioner's claims based on California Senate Bill 261 are not cognizable on federal habeas review. See Estelle, 502 U.S. at 68.

1. Ground Five

In ground five, petitioner appears to argue that he is entitled to release under Senate Bill 261 because he committed the underlying offense at age 21, he is remorseful, sympathetic with the family of the deceased, and has "paid his due." (ECF No. 1 at 33.) However, as pointed out by respondent, petitioner does not argue that he was denied a parole hearing or that the Board failed to properly consider him for parole.[11] Petitioner is not challenging a denial of parole in this action. Thus, his fifth ground fails to state a viable habeas claim.

2. Ground Six

In his sixth ground, petitioner argues that Senate Bill 261 negates petitioner's conviction of second degree murder because the "diminished culpability" standard set forth therein eliminates malice, expressed or implied, recognizing that due to their young age, juvenile offenders are "not as good at understanding the risks and consequences of their actions; resisting impulse and peer pressure; or controlling their surroundings." (ECF No. 1 at 34-35.) Petitioner

---

[11] In addressing Swarthout, 131 S. Ct. 862, the Ninth Circuit stated that "[w]hile the Court did not define the minimum process required by the Due Process Clause for denial of parole under the California system, it made clear that the Clause's requirements were satisfied where the inmates 'were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied.'" Pearson v. Muntz, 639 F.3d 1185, 1191 (9th Cir. 2011); Roberts v. Hartley, 640 F.3d 1042, 1046 (9th Cir. 2011) (under the decision in procedural due process requirement is met as long as the state provides an inmate seeking parole with an opportunity to be heard and a statement of the reasons why parole was denied).

cites no federal authority applying Senate Bill 261 in the manner he argues.  As written, petitioner

fails to state a cognizable habeas claim on the basis of Senate Bill 261.

However, respondent points out that petitioner may be trying to avail himself of the

benefits of Montgomery v. Louisiana, 136 S. Ct. 718 (2016), but argues such effort is unavailing

because petitioner was not sentenced to life without the possibility of parole.  (ECF No. 23 at 9-

10.)  For the following reasons, it appears respondent is correct.

In 2012, the United States Supreme Court held that mandatory life without parole for

juvenile homicide offenders under the age of 18 violates the Eighth Amendment's prohibition on

cruel and unusual punishments.  Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012).  The Court

found that, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that

harshest prison sentence," mandatory life without parole "poses too great a risk of

disproportionate punishment."  Id.  Although Miller did not foreclose a sentencing court's ability

to impose life without parole on a juvenile homicide defendant, the Court explained that the

sentence must "take into account how children are different, and how those differences counsel

against irrevocably sentencing them to a lifetime in prison."  Id.

In 2016, the Supreme Court held that Miller announced a substantive rule of constitutional

law and applies retroactively.  Montgomery, 136 S. Ct. at 736.

The State of California, in response to Miller, enacted Senate Bills 260 and 261, codified

at California Penal Code § 3051.  Under these laws, a person convicted of an offense committed

before the age of 23 who received a sentence of 25 years or less "shall be eligible for release on

parole by the board during his or her 20th year of incarceration at a youth offender parole hearing.

. . ."  Penal Code § 3051(b)(2).  The parole hearing "shall provide for a meaningful opportunity to

obtain release."  Penal Code § 3051(e).  Consistent with the concerns identified in Miller, if the

Board of Parole Hearings uses "psychological evaluations and risk assessment instruments" to aid

its decision-making, then those evaluations and instruments "shall take into consideration the

diminished culpability of juveniles as compared to that of adults, the hallmark features of youth,

and any subsequent growth and increased maturity of the individual."  Penal Code § 3051(f)(1).

////

Subsequently, the California Supreme Court confirmed that Penal Code § 3051 applies retroactively to eligible juvenile offenders.  People v. Franklin, 63 Cal. 4th 261 (May 26, 2016).  Because Franklin committed the controlling offense before age 18, § 3051 applied, but because Franklin would be eligible for parole after 25 years in prison, at age 41, the California Supreme Court found Franklin was not serving the functional equivalent of life without the possibility of parole and thus a Miller claim did not arise.  Franklin, 63 Cal. 4th at 261.

On August 10, 2016, the Ninth Circuit addressed the interplay of Miller and California sentencing law.  Demirdjian v. Gipson, 832 F.3d 1060 (9th Cir. 2016).  Demirdjian was 15 when he was convicted of murdering two boys and sentenced to two consecutive terms of 25 years to life.  Id. at 1065.  On appeal, Demirdjian argued the sentence violated the Eighth Amendment because he was a juvenile at the time.  Id.  The state appellate court affirmed the conviction, finding that no United States Supreme Court precedent barred the sentence.  Id.  The California Supreme Court denied the petition for review.  Id., citing People v. Demirdjian, 144 Cal. App. 4th 10 (2006).  The Ninth Circuit held that the state appellate court's decision was not contrary to clearly established Supreme Court authority because Miller was not decided until 2012, and Demirdjian's sentence, for which he would be eligible for parole at age 66, was not the "functional equivalent" of a life-without-parole sentence.  Demirdjian, 832 F.3d at 1076, 1077, citing Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003) (describing sentence for which parole possible at age 87 as "materially distinguishable" from a life without parole sentence).[12]

Here, petitioner's rights under Miller could not be violated because he was not under age 18 at the time he committed the second degree murder (he was 21), and he was not sentenced to life without parole.[13]

_____

[12] In a footnote, the Ninth Circuit noted that Demirdjian would be eligible for parole at age 41 under the terms of Penal Code § 3051, but declined to rest the holding on Penal Code § 3051, or to decide whether 28 U.S.C. § 2254(d)(1) would permit such holding.  Demirdjian, 832 F.3d at 1077 n.13, citing Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

[13] A petition may be denied on the merits without exhaustion of state court remedies.  28 U.S.C. § 2254(b)(2).

In addition, only the United States Supreme Court can recognize a new rule of constitutional law for the purposes of 28 U.S.C. § 2244(d)(1)(C).  See Dodd, 545 U.S. at 358-60 (construing identical language in 28 U.S.C. § 2255 as expressing "clear" congressional intent that delayed accrual is inapplicable unless the United States Supreme Court itself has made the new rule retroactive).  Thus, the California Supreme Court's holding in Franklin, 63 Cal. 4th at 263, offers petitioner no federal habeas relief.  In light of the authority discussed above, it is unclear whether California courts would now offer petitioner relief under Penal Code § 3051.[14]

B.  People v. Banks (Ground Seventeen)

In ground seventeen, petitioner argues that throughout his case, he has asserted that he did not intend to kill the victim, and notes petitioner was not sentenced to LWOP.  (ECF No. 1 at 58.)  Petitioner contends that under People v. Banks, 61 Cal. 4th 788 (Cal. July 9, 2015), he is entitled to a sentence reduction because of his lack of intent to kill.

In Banks, the California Supreme Court found insufficient evidence for felony murder special circumstance when the defendant was absent from the scene and there was no evidence he saw or could have heard the shooting, had a role in instigating it or could have prevented it, or knew that his actions would involve a grave risk of death.  Id., 61 Cal. 4th 788.  "The issue before us is under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty."  61 Cal. 4th 794.

As set forth above, only the United States Supreme Court can recognize a new rule of constitutional law for the purposes of 28 U.S.C. § 2244(d)(1)(C).  See Dodd, 545 U.S. at 358-60.  Accordingly, even if Banks did enunciate a new rule of constitutional law, petitioner would not be entitled to a later start date of the limitations period on that basis.[15]

---

[14]  But nothing in this order precludes petitioner from requesting a youth offender parole hearing from the Board under California Penal Code § 3051, or seeking habeas relief on such ground in the California courts.

[15]  Moreover, petitioner conflates the felony-murder doctrine with second degree murder.  Unlike Banks, petitioner was convicted of second degree murder, and sentenced to life with the possibility of parole.  Petitioner was not convicted of felony murder or sentenced to death or a life term without the possibility of parole.

C. <u>Conclusion:  No Later Start Date</u>

Because petitioner identified no constitutional right that is newly recognized and applied retroactively to habeas cases by the United States Supreme Court, the undersigned finds that petitioner is not entitled to a later start date for the statute of limitations period under 28 U.S.C. § 2244(d)(1)(C).

VII. <u>Order</u>

Because petitioner filed the instant petition over 18 years after the limitations period, and he is not entitled to equitable tolling or a later start date for the limitations period, respondent's motion to dismiss should be granted.

Accordingly, IT IS ORDERED that:

1.  Respondent's motion to dismiss (ECF No. 13) is granted;

2.  This action is dismissed without prejudice; and

3.  The court declines to issue the certificate of appealability referenced in 28 U.S.C. § 2253.

Dated:  March 20, 2017

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/mcco0642.156b

25